CHESAPEAKE & OHIO RAILWAY COMPANY *v.* MARTIN ET AL.

No. 155. Argued March 4, 1931.—Decided April 13, 1931.

*Mr. Meade T. Spicer, Jr.,* with whom *Mr. Walter Leake* was on the brief, for petitioner.

No appearance for respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is an action brought by the respondents against petitioner in a state court to recover damages for the "misdelivery" of a carload of potatoes transported on a through bill of lading in interstate commerce. On November 6, 1925, the shipment was initiated in Michigan by another carrier, and transferred to the petitioner for final transportation to, and delivery in, Richmond, Virginia. Respondents had arranged for the storage of potatoes with the Bowman Transfer Company in Richmond, and petitioner had been notified that all potatoes billed to respondents were to be delivered at the warehouse of that company. The potatoes arrived at petitioner's yards in

Richmond six days after shipment from Michigan, and four days later (November 16th) were inspected by respondents, who thereupon paid all freight and demurrage charges and became entitled to delivery. To make delivery to the Bowman warehouse it first was necessary to transfer the car of potatoes to the Southern Railway; and the usual time required for the entire movement was not more than forty-eight hours. Petitioner, on November 17th, transferred the car to the Southern Railway, but by mistake directed that delivery be made to the warehouse of D. S. Harwood, where the car was unloaded and the potatoes were stored in the belief that they belonged to a customer of Harwood. The same day the Bowman Company mailed to respondents a warehouse receipt acknowledging the receipt and storage of the potatoes in the warehouse of that company; but a month later advised respondents by letter that the receipt had been issued in error, and that the car had been taken to the warehouse of D. S. Harwood. Notwithstanding this letter, respondents visited the Bowman warehouse and upon inquiry concluded that the potatoes were there. They made no inquiry of the petitioner or at the Harwood warehouse. Harwood did not know the respondents or suspect that they were the owners of the potatoes, until May 10, 1926, at which time he informed them that he had the car. The respondents then identified the potatoes, found them in a spoiled condition, sold them for a small sum, and brought this action. No notice of loss was given or claim for damages made until May 26, 1926, a period of six months and twenty days after the shipment from Michigan.

The bill of lading contains the following provision:

" Claims for loss, damage, or injury to property must be made in writing to the originating or delivering carrier or carriers issuing this bill of lading within six months after delivery of the property (or, in case of export traffic, within nine months after delivery at port of export), or

in case of failure to make delivery, then within six months (or nine months in case of export traffic) after a reasonable time for delivery has elapsed; provided that if such loss, damage or injury was due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery."

Petitioner's freight agent testified that a reasonable time after shipment for delivery of the potatoes to the consignee in Richmond would be about eight days, and that if any longer time were taken it would be considered a delayed movement. There was no evidence to the contrary.

At the conclusion of respondents' case in rebuttal, petitioner demurred to the evidence upon the ground that the action was barred by the provision of the bill of lading requiring claims for loss or damage in case of failure to make delivery to be made " within six months after a reasonable time for delivery has elapsed." The demurrer was overruled and judgment entered against petitioner upon verdict for the sum of $1684.39. The trial court said that the testimony of the freight agent was no part of the plaintiffs' case; that the misdelivery was made through his office; that although unimpeached the jury would not be bound to accept the evidence of the agent as conclusive; and, consequently, that the court was obliged to disregard it and overrule the demurrer to the evidence. The judgment was affirmed on appeal. 143 S. E. 629; 154 Va. 1; 152 S. E. 335.

The provision of the bill of lading that claim for loss in case of failure to deliver must be made within six months after the lapse of a reasonable time for delivery is authorized by federal statute* and is valid and appli-

---

* Transportation Act, 1920, c. 91, 41 Stat. 456, 494; U. S. C., Title 49, § 20(11).

cable, *Georgia, Fla. & Ala. Ry.* v. *Blish Co.*, 241 U. S. 190, 197; and, since it was issued in respect of an interstate shipment pursuant to an act of Congress, the bill of lading is an instrumentality of such commerce, and the question whether its provisions have been complied with is a federal question to be determined by the application of federal law. *Southern Express Co.* v. *Byers*, 240 U. S. 612, 614; *Southern Ry.* v. *Prescott*, 240 U. S. 632, 635-636; *Georgia, Fla. & Ala. Ry.* v. *Blish Co.*, *supra*, p. 195; *St. Louis, I. Mt. & So. Ry. Co.* v. *Starbird*, 243 U. S. 592, 595.

The State Court of Appeals affirmed the judgment on the grounds that the evidence was sufficient to show compliance on the part of respondents with the requirement of the bill of lading in respect of the time for making claim; and that, in any event, the petitioner was estopped from asserting noncompliance with that requirement. We are of opinion that neither ground is tenable.

. *First.* Since the claim for loss was not made until the expiration of six months and twenty days after the shipment, the first ground resolves itself into the question whether twenty days was a reasonable time for the delivery of the car to the consignee. What constitutes a reasonable time depends upon the circumstances of the particular case. As applied to a case like this, it means such time as is necessary conveniently to transport and make delivery of the shipment in the ordinary course of business, in the light of the circumstances and conditions surrounding the transaction. *Hazzard Co.* v. *Railroad Co.*, 121 Me. 199, 202-203; 116 Atl. 258. Compare *First Nat. Bank* v. *Pipe & Contractors' Supply Co.*, 273 Fed. 105, 107-108.

A demurrer to the evidence must be tested by the same rules that apply in respect of a motion to direct a verdict. *Schuchardt* v. *Allens*, 1 Wall. 359, 369-370; *Merrick's Executor* v. *Giddings*, 115 U. S. 300, 305. In ruling upon either, the court must resolve all conflicts in the evidence against the defendant; but is bound to sustain the demur-

rer or grant the motion, as the case may be, whenever the facts established and the conclusions which they reasonably justify are legally insufficient to serve as the foundation for a verdict in favor of the plaintiff. *Ibid.; Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, 524, and cases cited; *Chicago, M. & St. P. Ry. Co.* v. *Coogan,* 271 U. S. 472, 476–478. And, in the consideration of the question, the court, as will be shown, is not at liberty to disregard the testimony of a witness on the ground that he is an employee of the defendant, in the absence of conflicting proof or of circumstances justifying countervailing inferences or suggesting doubt as to the truth of his statement, unless the evidence be of such a nature as fairly to be open to challenge as suspicious or inherently improbable. The agent at petitioner's freight office in Richmond, shown by twenty years' experience to be qualified to speak, testified, in part, as follows:

" Q. Mr. Neiss, the bill of lading issued covering this car shows it was consigned from Wyman, Michigan, on November 6th, and the yard records at Fulton show it arrived there on November 12th. Are you in a position to say whether or not that was a reasonable movement?

" A. Yes, sir.

" Q. Would you say it was a reasonable movement?

" A. Yes, sir.

" Q. Have you had occasion in the course of your experience to handle in-bound shipments?

" A. About twenty years.

" Q. During the course of that time have you become in a general way familiar with the time required for movements of like character as this?

" A. Yes, sir.

" Q. What would you say would be a reasonable time for shipment and delivery to a consignee at Richmond of a car under those circumstances from that point?

"A. About eight days.

" Q. Would anything beyond that be considered a delayed movement?

" A. Well, yes, sir, I think it would.

" Q. Mr. Neiss, Mr. Martin has testified that freight was paid on this car the morning of November 16th, and order given for disposition to the Bowman Warehouse. Are you in a position to state how long it would take the C. & O. to have that order carried out to the extent of having the car sent to the interchange track?

"A. Well, if we give the order to the yard any time up to 4 o'clock in the afternoon, it is usually moved up to 5: 15.

" Q. The same day?

"A. Yes, sir, same day.

" Q. Suppose the order is given after 4 o'clock or received after 4 o'clock, at Fulton yards?

"A. It is laid over until next morning between 9 and 1 o'clock.

" Q. So that the time required for the carrying out of that order by the C. & O. would be less than 24 hours?

"A. Yes, sir."

It sufficiently appears that the time reasonably necessary for completion of delivery to the Bowman warehouse after the receipt of the shipment at petitioner's yards would, in no event, exceed forty-eight hours.

Not only is the estimate of the agent reasonable upon its face and in accordance with probability; and not only is it wholly unchallenged by other evidence or circumstances; but it is so completely corroborated by the undisputed facts in respect of this very shipment as to put it beyond the reach of a fair doubt. The movement of the car from the point of origin to the yards of petitioner in Richmond actually was made in six days; and if there be added full forty-eight hours thereafter for completing delivery to the Bowman warehouse, the testimony of the agent as to time stands verified by indubitable test. In

the face of this record the conclusion of the court that it was still open for the jury to say that not eight days merely, but twenty days, fell short of being a reasonable time for delivery is so clearly erroneous as to cause the ruling of the court, in effect, to rest upon nothing more substantial than the power of a jury arbitrarily to disregard established facts.

We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination. Its accuracy was not controverted by proof or circumstance, directly or inferentially; and it is difficult to see why, if inaccurate, it readily could not have been shown to be so. The witness was not impeached; and there is nothing in the record which reflects unfavorably upon his credibility. The only possible ground for submitting the question to the jury as one of fact was that the witness was an employee of the petitioner. In the circumstances above detailed, we are of opinion that this was not enough to take the question to the jury, and that the court should have so held.

It is true that numerous expressions are to be found in the decisions to the effect that the credibility of an interested witness always must be submitted to the jury, and that that body is at liberty to reject his testimony upon the sole ground of his interest. But these broad generalizations cannot be accepted without qualification. Such a variety of differing facts, however, is disclosed by the cases that no useful purpose would be served by an attempt to review them. In many, if not most, of them, there

were circumstances tending to cast suspicion upon the testimony or upon the witness, apart from the fact that he was interested. We have been unable to find any decision enforcing such a rule where the facts and circumstances were comparable to those here disclosed. Applied to such facts and circumstances, the rule, by the clear weight of authority, is definitely to the contrary. *Hauss* v. *Lake Erie & W. R. Co.*, 105 Fed. 733; *Illinois Cent. R. Co.* v. *Coughlin*, 132 Fed. 801, 803; *Hull* v. *Littauer*, 162 N. Y. 569; 57 N. E. 102; *Second Nat. Bank* v. *Weston*, 172 N. Y. 250, 258; 64 N. E. 949; *Johnson* v. *N. Y. C. & H. R. R. Co.*, 173 N. Y. 79, 83; 65 N. E. 946; *St. Paul Cattle Loan Co.* v. *Housman*, 54 S. D. 630, 632; 224 N. W. 189; *M. H. Thomas & Co.* v. *Hawthorne* (Texas), 245 S. W. 966, 972; *Dunlap* v. *Wright* (Texas), 280 S. W. 276, 279; *Still* v. *Stevens* (Texas), 13 S. W. (2d) 956; *Marchand* v. *Bellin*, 158 Wis. 184, 186; 147 N. W. 1033. Of like effect, although in a different connection, see also *Roberts* v. *Chicago City Ry. Co.*, 262 Ill. 228, 232; 104 N. E. 708; *Veatch* v. *The State*, 56 Ind. 584, 587; *Marq., Hought. & Ont. R. R.* v. *Kirkwood*, 45 Mich. 51, 53; 7 N. W. 209; *Berzevizy* v. *D., L. & W. R. R. Co.*, 19 App. Div. (N. Y.) 309, 313; 46 N. Y. S. 27; *Miller's Will*, 49 Ore. 452, 464; 90 Pac. 1002.

In *Hull* v. *Littauer, supra,* the doctrine that the question of credibility of a witness must be submitted to the jury was held to be not an inflexible one, even though such witness be a party to the action. In that case the defendants moved for direction of a verdict in their favor, which was resisted by plaintiff on the ground that the proof upon which the motion was based rested upon the evidence of interested parties. The court, nevertheless, sustained the motion. On appeal the State Court of Appeals affirmed this judgment, saying (p. 572):

" It is true that the evidence to establish the entirety of the contract was given by the defendants; but the rule which the plaintiff invokes is not applicable to such a case

as this. Generally, the credibility of a witness, who is a party to the action and, therefore, interested in its result, is for the jury; but this rule, being founded in reason, is not an absolute and inflexible one. If the evidence is possible of contradiction in the circumstances; if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it. Where, however, the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities; nor, in its nature, surprising, or suspicious, there is no reason for denying to it conclusiveness. Though a party to an action has been enabled, since the legislation of 1857, (Ch. 353, Laws of 1857), to testify as a witness, his evidence is not to be regarded as that of a disinterested person and whether it should be accepted without question, depends upon the situation as developed by the facts and circumstances and the attitude of his adversary. In *Lomer* v. *Meeker,* (25 N. Y. 361), where the defense to an action upon a promissory note was usury and the indorser gave the evidence to establish it, without contradiction, it was said that ' it was the duty of the court, in such case, to dismiss the complaint, or nonsuit the plaintiff, or direct a verdict for the defendants. It is a mistake to suppose that, because the evidence came from the defendant, after the plaintiff had rested, the case must go to the jury. . . . The argument is, that this could not properly be done, because there was a question of credibility raised in respect to the witness Bock, who proved the usury. But this objection is untenable. The witness was not impeached or contradicted. His testimony is positive and direct, and not incredible upon its face. It was the duty of the court and jury to give credit to his testimony.' More recently, in *Kelly* v. *Burroughs,*

102 N. Y. 93; 6 N. E. 109, Judge Danforth, after observing that, as the facts were not disputed, there was no occasion to present them to the jury, said ' the mere fact that the plaintiff, who testified to important particulars, was interested was unimportant in view of the fact that there was no conflict in the evidence, or any thing or circumstance from which an inference against the fact testified to by him could be drawn.' "

In *Hauss* v. *Lake Erie & W. R. Co., supra,* a direction of the trial judge to find for the defendant was sustained, although the motion rested upon the testimony of the conductor of the train. The court put aside the objection that the witness was an employee of the defendant, and had an interest to show that he had performed his duty and a motive falsely to represent that he had done so, saying (p. 735):

" The testimony of the witness was not contradicted by that of any other witness, nor was it brought in question by the cross-examination nor by the admitted facts of the case; and, outside of the suggested interest and motive, there is not a fact or circumstance in the case which tends to raise a doubt as to the truth of his testimony."

And, at p. 736:

" . . . nor do the facts and circumstances of the case justify an impeaching presumption against the credibility of the witness, founded upon his mere relation to the parties and to the subject-matter of the controversy, which should overcome the counter presumption that, as an uncontradicted witness, testifying under oath, he spoke the truth."

In *M. H. Thomas & Co.* v. *Hawthorne, supra,* at p. 972, the rule is thus stated:

"A jury cannot arbitrarily discredit a witness and disregard his testimony in the absence of any equivocation, confusion, or aberration in it. It is not proper to submit uncontradicted testimony to a jury for the sole purpose of

giving the jury an opportunity to nullify it by discrediting the witness, when nothing more than mere interest in the case exists upon which to discredit such witness. The testimony must inherently contain some element of confusion or contrariety, or must be attended by some circumstance which would render a total disregard of it by a jury reasonable rather than capricious, before a peremptory instruction upon the evidence can be said to constitute an invasion of the right of trial by jury. That it is proper for a trial court to instruct a verdict upon the uncontradicted testimony of interested parties, when it is positive and unequivocal and there is no circumstance disclosed tending to discredit or impeach such testimony, can be said to be a settled rule in Texas."

*Second.* The estoppel relied upon seems to be that since petitioner negligently delivered the shipment to the Harwood warehouse, instead of to the Bowman warehouse, and respondents made claim for the loss promptly after discovering the negligent misdelivery, petitioner may not be heard to complain that the claim was not made at an earlier day. The court below said [143 S. E. 629, 630]:

" Whatever may be the decisions of the courts elsewhere, we are of the opinion that the doctrine laid down in *Chesapeake & Ohio Ry. Co.* v. *Rebman &c.,* 120 Va. 71, should be adhered to," and then quoted from that case the following:

" ' If it be conceded that plaintiffs were under obligation to give notice of their demand under the circumstances of this anomalous transaction, the evidence shows that such notice was given without delay as soon as the negligence of the defendant which occasioned the loss was discovered.' "

But the vice of this position is that, in following its own prior decision, the court ignored the decision of this court to the contrary. This lawfully it could not do, the ques-

tion, as we have shown, being a federal question to be determined by the application of federal law. The determination by this court of that question is binding upon the state courts and must be followed, any state law, decision, or rule to the contrary notwithstanding. And it was distinctly held by this court in *Georgia, Fla. & Ala. Ry.* v. *Blish Co., supra* (p. 197), that the parties to a contract of interstate shipment by rail, made pursuant to the Interstate Commerce Act, could not waive its terms; "nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that conduct and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the Act and open the door to the very abuses at which the Act was aimed." The provision of the bill of lading involved there was identical with that here under consideration; and there, as here, the delivery was to another in violation of instructions. The Blish Company insisted that the phrase "failure to make delivery" did not cover a case of misdelivery, but this court said (p. 195):

"The clause with respect to the notice of claims—upon which the plaintiff in error relies in its second contention—specifically covers 'failure to make delivery.' It is said that this is not to be deemed to include a case where there was not only failure to deliver to the consignee but actual delivery to another or delivery in violation of instructions. But 'delivery' must mean delivery as required by the contract, and the terms of the stipulation are comprehensive,—fully adequate in their literal and natural meaning to cover all cases where the delivery has not been made as required. When the goods have been misdelivered there is as clearly a 'failure to make delivery' as when the goods have been lost or destroyed; and it is quite as competent in the one case as in the other

for the parties to agree upon reasonable notice of the claim as a condition of liability."

Other state courts have correctly interpreted the decision of this court in that case as applying to a situation like the one here presented, and have followed it, although in some instances their prior decisions had been to the contrary. See, among others, *Bronstein* v. *Payne*, 138 Md. 116, 120; 113 Atl. 648; *Metz Co.* v. *Boston & Maine R. Co.*, 227 Mass. 307; 116 N. E. 475. Indeed, the Supreme Court of Appeals of Virginia itself, in *Davis* v. *Rodgers*, 139 Va. 618, 625; 124 S. E. 408, seems to have taken the same view.

It is held by this court that the shipper may not invoke the doctrine of estoppel against the right to collect the legal rate, because to do so would be to avoid the requirement of the law as to equal rates. *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Fink*, 250 U. S. 577, 582; *Louisville & N. R. Co.* v. *Central Iron Co.*, 265 U. S. 59, 65, and cases cited. These decisions lend support to our conclusion in respect of the matter here. Whether under any circumstances the shipper may rely upon that doctrine in avoidance of the time limitation clause of the bill of lading, we need not now determine. But the *Blish Company* case makes clear that the fact that delivery was made contrary to instructions, due to the misunderstanding or negligence of the carrier, cannot successfully be set up as an estoppel against the claim of a failure to comply with the requirement of the bill of lading here involved. To allow it would be to alter the terms of a contract, made in pursuance of the Interstate Commerce Act and having, in effect, the quality of a statute of limitation, and thus to open the door for evasions of the spirit and purpose of the act to prevent preferences and discrimination in respect of rates and service. Compare *A. J. Phillips Co.* v. *Grand Trunk Western Ry. Co.*, 236 U. S. 662, 667.

*Judgment reversed.*